THE MAYOR AND ALDERMEN OF SAVANNAH *vs.* FEELEY.

1. Whether the right to run omnibusses, baggage-wagons and other vehicles to and from the railroad depots in the city of Savannah, is part of the business or trade of keeping public stables in said city, so as to make a tax upon the business of keeping such stables include also a tax on the business of running such vehicles to and from the railroads, depends upon the custom of such trade or business in the city; but it is only binding on the city authorities when of

such universal practice as to justify the conclusion that by implication the two occupations were one and the same business.

2. The recovery of back taxes from municipal corporations, paid for license to engage in business of any sort within their limits, where the power to issue such license is within the jurisdiction of such corporations, should not be encouraged by courts, especially when suits therefor are brought for a series of years after payment of such license taxes ; and recovery will in no case be allowed when such payments have been voluntarily made.

3. The payment will be held to be voluntary in such cases unless actually made under duress, and a mere agreement to pay, though such agreement be under duress, will not make the subsequent payment involuntary, if no legal steps be taken to resist it, and if the payment itself be voluntary.

4. A compromise decree on a bill for injunction against the payment of such license tax for a subsequent year betwent the city as de fendant and many complainants, the plaintiff in the action being one of them, is not admissible in evidence against the city in a suit to recover money paid for such license taxes for prior years.

Tax. License. Municipal Corporations. Evidence. Before Judge FLEMING. Chatham Superior Court. March Term, 1880.

Feeley brought suit against the Mayor, etc., of Savannah, to recover money which he alleged they had unlawfully compelled him to pay for license fees for the privilege of running his omnibusses, when he claimed that he already had the right to do so under his license as the keeper of a public stable. The ordinances in the year 1871 on this subject were as follows: "Every owner or owners, lessee or lessees of a public stable, $100.00."

* * * * "Section VI. And it is hereby further ordained by the authority aforesaid, that hereafter the following shall be the prices for license or badges for the vehicles and animals hereinafter mentioned : * * *

For each one horse cart or wagon, $12.00 ; for each one horse cab, hack or buggy, $20.00 ; for each two horse cab, hack or pleasure carriage, $40.00 ; for each two horse omnibus, $40 00."

Penalties were provided by fine and the issuance of execution for failure to take out a license.

Substantially the same provisions were made by the ordinances of the other years involved in this suit (1869 to 1873). In 1875 a number of livery stable keepers filed their bill to enjoin the municipal authorities from collecting the license fee or tax on vehicles for transporting passengers. (See 55 *Ga.*, 33). This bill afterwards resulted in a compromise decree by which the collection of such license fees for that year was enjoined. The ordinance for that year provided that "every person engaged in the business of transporting or carrying goods, wares, merchandise, passengers or baggage for hire, by means of wagons, drays, trucks, carts, omnibusses, or letting carriages, or other vehicles for hire, shall pay a tax according to the number and character of the vehicles employed in such business, viz :" (The amount of tax being as set forth in the ordinances of 1869, 1870, 1871, 1872 and 1873).

On the trial of the present case several witnesses testified that they considered the running of omnibusses to depots, etc., a part of the business of the keeper of a public stable. It appeared, however, that some of the stable keepers carried on this transportation business and some did not. Plaintiff himself made this statement in his testimony : "I was in partnership with my brother Mr. Tom Feeley in transporting passengers and baggage to depots and hotels of late years, but we are not in partnership in the livery stable business."

The court admitted in evidence, over objection of defendants' counsel, the decree in the injunction case stated above.

The jury found for the plaintiff. Defendants moved for a new trial, which was refused, and they excepted.

H. C. CUNNINGHAM, for plaintiffs in error, cited Code, §1419, 1422; 42 *Ga.*, 325; Burroughs on Taxation, 67, 154, 396; 49 *Ga.*, 195; 50 *Ib.*, 536; 42 *Ib.*, 596; 62 *Ib.*,

645 ; 55 *Ib*., 33 ; 28 *Ib*., 543 ; 2 Burr., 1005 ; 7 T. R., 269 ; 2 H. Bl., 214 ; 5 Taunt., 160 ; 7 *Ga*., 64 ; Code, §3121 ; 50 *Ga*., 304 ; 49 *Ib*., 455 ; 48 *Ib*., 309 ; 28 *Ib*., 121 ; 62 *Ib*., 538 ; 9 Cowen, 674 ; 7 Cush., 125 ; 2 Metc., 181 ; 6 Barn. & Cress., 671 ; 6 Cl. & Fin., 911 ; 2 Smith's L. C., 403, 293 ; 39 Me., 559 ; Cowper, 414 ; 1 Epinasse, 84, 279 ; 2 *Ib*., 546 ; 9 Bing., 644 ; 11 Ad. & El., 983 ; 1 Story's Eq. Jurisprudence, §§137, 138 ; 2 Rich. Law Rep., 317 ; 10 Peters, 317 ; 7 Cush., 125 ; 1 Wend., 355 ; 2 Denio, 26 ; 22 *Ga*., 594 ; 14 *Ib*., 89 ; 95 U. S., 210 ; 6 Sm. & M., (Miss.) 13 ; 2 Metc., 445 ; 2 Dillon on Mun. Corp., §751 ; 8 Cush., 55 ; Code, §4847 ; 37 N. Y., 513 ; 34 Ala., 400 ; 50 Ala., 307 ; 22 Am., 512.

TOMPKINS & DENMARK, for defendants, cited constitution of 1868, art. 1, sec. 27 ; 55 *Ga*., 33 ; 42 *Ib*., 595 ; 50 *Ib*., 530 ; 2 Dillon on Mun. Corp., §§609, 610, 611 ; Cooley on Taxation, 567-569, 396, 20, 406-408 ; 42 *Ga*., 325 ; Code, §§4866, 4847, 4860, 4861 ; 1 Dillon on Mun. Corp., §§291·293 ; 47 *Ga*., 562 ; 41 *Ib*., 21 ; 48 *Ib*., 309 ; 28 *Ib*., 121 ; 55 *Ib*., 410 ; Cooley on Taxation, 571, 565, 568 ; Dillon on Mun. Corps., §751 ; Code, §2637 ; 9 Johnson (N. Y), 201, 370 ; 10 Peters, 150 ; 61 *Ga*., 229 ; 97 U. S., 185 ; 2 Smith's L. C., 405, 416 ; 48 Iowa, 507 ; 40 Mich., 367 ; Mayor, etc., of Griffin *vs*. Powell, February Term, 1880 ; Code, §§2056, 2057 ; 1 Kelly, 287 ; 2 *Ib*., 371 ; 15 *Ga*., 322 ; 18 *Ib*., 407 ; 19 *Ib*., 537 ; 20 *Ib*., 561 ; 33 *Ib*., 219 ; acts, 1855-6, page 237 ; Code, §§2925 *a*,5, 1651, 1670-1872.

JACKSON, Chief Justice.

1, 2, 3. In the case of the *City of Savannah vs. Dehony et al.*, 55 *Ga*., 33, the judgment of this court was, that it would not control the discretion of the chancellor in granting an injunction to stop the city from collecting taxes for the year 1875, imposed by an ordinance for that year, because it was properly a question of fact for the

jury whether the business of a keeper of a public stable embraced the business of running omnibusses and hacks to and from the railroads, the testimony before the chancellor being sufficient to authorize the grant of the injunction on the question of the one business embracing the other, until the case could be sifted and solved before a jury under a full and fair trial in open court.

The present suit is for the recovery of taxes paid by the plaintiff for license to run omnibusses and vehicles, and for badges for the same, for the years 1869, 1870, 1871, 1872 and 1873, on the ground that they were illegally imposed, inasmuch as the business of keeper of a public stable embraced that of running these vehicles. The plaintiff was one of the complainants in the injunction cause alluded to above, and it is urged that the principle ruled then and there controls this case. We do not think so. The ordinances are not the same. Under the ordinance of 1875, passed upon in the 55 *Ga.*, the *business* of transporting in omnibusses, carriages, etc., etc., is taxed *eo nomine*; while such is not the case in the ordinances of 1871 *et seq.*, which are involved here. In these, the money is paid for license to run such vehicles. It is true that the owners or lessees of public stables are taxed alike in both instances, but that which is invoked to make the tax illegal and double is not the same. In the one case it is an imposition for license to run certain vehicles, in the other it is *eo nomine* a tax on *business*.

But pretermitting this point, and conceding that in substance the ordinances amount to the same thing; then, all that is decided in 55 *Ga.*, does not control this, because that decision is that this court will not control the chancellor when he exercises his discretion on the question of a temporary *ad interim* injunction, unless he has violated some principle of law or shocked all sense of equity in weighing the facts before him, and we could not say that in that case he had done either.

The very point which that decision in that case reserved for the jury was whether or not custom made the business of the keeper of a public stable the same as that of running omnibusses, etc., to and from railroads, and this court does say that what was then before the chancellor in the shape of depositions, preponderated to fix the one business as incident to the other ; and that is the sum and substance of the judgment of this court in that case.

So that, conceding the identity in substance of these ordinances, it was for the jury to say whether the custom was so established by the facts as to make the one business embrace the other, under the rules of the law given by the court, and it is for the court to say, on reviewing the verdict, whether or not the testimony established the custom, or was sufficient *in law* to set it up ? What is that sufficiency ? How much preponderating weight must there be to establish a binding custom so as to make it part of a contract, especially such a contract as to prohibit or curtail the levy of taxes to carry on government, state or municipal ? Our own Code responds as to ordinary contracts, as follows: "The custom of any trade or business shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract."—Code, §1, sub-sec. 4. In one case this court held that this word "universal," while it did not mean in this section, *absolutely without exception*, yet it did mean so wide and all embracing that the exception merely proved the universality of the rule. So understanding it, is this custom proven here, or was this point of inquiry fairly given to the jury under this provision of our Code ? We cannot so think.

It is in testimony that public stables embrace some such stables where no vehicles at all are used for any purposes. It is in testimony by the plaintiff himself, that his brother and himself were in partnership in the omnibus business, but not in the stable business. It is difficult to see how

they were then identical, or that one by implication necessarily embraced the other as part of a contract·in regard to public stables; and we cannot see that the testimony of a few men engaged in the same occupation, and having the same kind of suits pending against the city as the plaintiff, is sufficient in law to set up a custom so *universal·* over the city of Savannah in all *public stables* therein, as to preclude the city authorities from levying a tax on the business of running omnibusses and hacks, and taking out license and using badges therefor, in addition to a tax for the mere business of keeping a public stable, which is a general term embracing a variety of stables kept *publicly* for various and distinct purposes.   Such a rule if enforced,would be unjust,operating unequally on those public stables that merely boarded, or sold, or doctored horses; for they would be taxed on their business the same as those other public stables, or the owners and lessees of that class, who not only did their business but added to it other employments, in which other employments they formed partnerships, and created entities diverse and distinct.   It would be anything else than on the *ad valorem* principle.

This right to recover back taxes paid for license to engage in trade, after the trade has been carried on for years, does not seem to rest on sound principles of law or morals. The cases generally rest on some sudden discovery that the payment long acquiesced in was illegal, and straightway cupidity encourages the hope that possibly money may be made by suit therefor.   Though the law was open to resist the tax when laid and first attempted to be enforced, it is preferred to get the license to do the business to make money out of it, and then years afterwards, when some bolder adventurer elicits a decision of the courts calling in question the legality of something akin to taxes paid before, straightway to sue to recover them back.   It is against public policy and good morals to encourage any such speculation on the chances of law suits.   It is ag

public policy, especially to permit taxes to be recovered back in such cases. Nor does it matter much whether those taxes are state or municipal. They are the wheels of government, and when taken away or clogged, government ceases to move, or rolls with a rickety and uncertain motion.

We think, therefore, that the law should be rigidly enforced so far as respects all such suitors, and such was the main view of the case of the town of *Thomson vs. Norris*, reported in 62 *Ga.*, 538, where it was rigidly enforced by this court in the case of a liquor dealer, and it should be so enforced, we think, against all persons who pay license to trade and then repudiate the bargain after they have reaped its fruits, and sue the other side for the consideration it had received after the suitor has enjoyed his part of the contract to the full. See also *Douglasville vs. Johns*, 62 *Ga.*, 423.

In no case where the payment of the tax was voluntary, will the recovery of it back be tolerated. And it is the *payment*, not a vague arrangement or bargain to pay, which must have been extorted by duress in order to permit recovery. The evidence in this case fails to show actual payments of money under duress, or to separate them from agreements to pay under duress and afterwards voluntary payment. It is really difficult to see how any payment can be said to be under duress, or rather any bargain to pay to operate on the *payment itself* as under duress, when the courts are open, when the remedy in chancery is ample, if not complete at law, and when the city execution for the tax can be suspended until the whole case may be fully tried; and by giving bond the business of the citizen cannot be hurt. If the city tax be illegal the remedy is wide to stop its enforcement; and if not stopped, it is the tax payer's own *laches*. And, therefore, it is held that no tax made and paid by execution can be recovered back. But it is enough here to hold now that if not actually paid under duress, it

will be construed to be paid voluntarily, and it cannot be recovered back.

.4. The final decree in the case of the *City of Savannah vs. Dehony et al.*, 55 *Ga.*, 33, should not have been admitted in evidence in this case, though the present plaintiff is one of the parties there and the city is the other. It was an agreed or compromise verdict and decree, and that alone should exclude it; but it was not the same tax, not for the same year, not under the same ordinance, and how much it may have prejudiced the city's case we cannot estimate. ·It may have controlled the verdict in the minds of men not accustomed to distinguish between cases, and been regarded as a surrender by the city of its right to exact license in former years because, in 1875, it had been held by this court that it could not tax business twice, and after that decision the city abandoned further contest and agreed to the decree perpetually enjoining the collecting of the tax for 1875. Because the courts would enjoin the collection of a tax in 1875, it does not follow that it would permit the same plaintiff to recover back a tax, though even exactly like that in 1875, paid in 1870 or 1871. It is a *non sequitur*, and for this reason the decree was not evidence.

Judgment reversed.